UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| SOUTHWEST REFRIGERATED WAREHOUSING SERVICES JOINT VENTURE, | § § § § | |
| | § | EP-16-CV-00421-DCG |
| *Plaintiff,* | § | |
| v. | § § | |
| M.A. & SONS, INC., | § § | |
| *Defendant.* | § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On November 13, 2018, the Court commenced a Bench Trial in the above-captioned cause. Having duly considered the parties' pleadings, witness testimony, and exhibits, the Court now enters its Findings of Fact and Conclusions of Law.[1]

### I. NATURE OF THE CASE

This case arises from a dispute over a storage contract. Plaintiff Southwest Refrigerated Warehousing Services Joint Venture seeks to recover the unpaid charges that Defendant M.A. & Sons, Inc. incurred while storing its chile product in Plaintiff's facility. Conversely, Defendant seeks to recover the value of its adulterated chile product that was damaged while being stored with Plaintiff and costs related to its attempts to mitigate damages.

### II. FINDINGS OF FACT

**A. Jurisdictional Facts**

1. Plaintiff is a Texas joint venture authorized to do business in Texas that operates a refrigerated storage facility in El Paso, Texas.

2. Defendant is a New Mexico corporation that harvests, processes, and sells chile product.

---

[1] To the extent that any finding of fact is more aptly characterized as a conclusion of law, or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts it as such.

3. Plaintiff seeks $122,219.02 in damages

4. Defendant seeks $630,856 in damages

**B. The Storage Agreement**

5. On or about September 3, 2015, Defendant contracted with Plaintiff to store its chile product in Plaintiff's storage facility in El Paso, Texas.

6. In tendering its product for storage in Plaintiff's facility, Defendant accepted Plaintiff's Standard Contract Terms and Conditions for Merchandise Warehouses (the "Storage Agreement"). *See* Trial Ex. P-8; Trial Ex. D-16 at 17.

7. Section 11 of the Storage Agreement contains clauses that limit Plaintiff's liability and the damages recoverable.[2]

8. According to the terms of the Storage Agreement, it cannot be modified unless done so in a writing signed by both parties. *See* Trial Ex. P-8; Trial Ex. D-16 at 17. The parties did not provide a signed writing modifying the terms.

**C. The Adulteration of Defendant's Chile Product**

---

[2] The relevant limitation on liability clause states:
> Warehouse shall not be liable for any loss or damage to goods tendered, stored or handled however caused unless such loss or damage resulted from the failure by warehouse to exercise such care in regard to them as a reasonably careful person would exercise under like circumstances and warehouse is not liable for damages which could not have been avoided by the exercise of such care.

Trial Ex. P-8. The relevant limitation on damages clause in the copy of the Storage Agreement provided by Plaintiff states:
> The Depositor declares that damages are limited to amounts billed, provided, however, that such liability may at the time of acceptance of this contract as provided in Section 1 be increased upon Depositor's written request on part or all of the goods hereunder in which event an additional monthly charge will be made based upon such increased valuation.

*Id.* However, the copies of the Storage Agreement provided by Defendant use the term "see rate quotation" instead of "amounts billed" in the clause. *See, e.g.,* Trial Ex. D-16 at 17. Nevertheless, Defendant did not make a written request to increase the liability or pay additional charges based upon an increased valuation.

9. In September 2015, Defendant began delivering its chile product to Plaintiff for storage. Defendant processed, bagged, and boxed it at its own facility. The chile product was delivered in 25-pound boxes containing five five-pound bags of roasted chile. The boxes were placed on pallets to make it easier to stack and store them. Defendant arranged its own transportation service to truck the pallets of chile product in refrigerated trailers to Plaintiff. Once it arrived, it would be unloaded onto Plaintiff's refrigerated dock, and Plaintiff would stack the pallets on shelves in a room in its refrigerated warehouse.

10. The early shipments had problems with the bags bloating due to respiration. Defendant and Plaintiff met about the bloating problem, and it was eventually resolved. However, when the chile product in the early shipments respirated, causing the bloating, the bags would breach the top of the boxes and could fall off the shelves on which they were being stored. The bloating also made it more difficult to stack the pallets holding the boxes of chile product safely. *See* Trial Ex. D-3 (showing the effects the bloating had on the bags, boxes, and pallets). Nevertheless, the bloated chile product was still merchantable. *See* Trial Ex. D-6.

11. Between October 2015 and February 2016, employees of Plaintiff used tools to breach Defendant's bloated bags of chile product.

12. In February 2016, Plaintiff's General Manager, Felipe Castaneda, caught employees puncturing bags of Defendant's product. Mr. Castaneda planned to terminate the employee who gave the orders, but the employee chose not to return to work after the incident. Another employee, Oscar Medina, caught the same employee instructing workers to pierce the bags of Defendant's product on a separate occasion and ordered them to stop.

13. At some point between October 2015 and December 2015, Defendant discovered that some of the bags of its chile product had been pierced, causing the product to adulterate.

14. Starting in December 2015, Defendant removed the chile product from storage with Plaintiff and shipped it back to its facility to determine which bags had been pierced.

15. Defendant began inspecting the bags and boxes of chile product for piercings in January 2016 and finished its inspection of the product in June 2016. *See* Trial Ex. D-7 at 341–345.

16. During its inspection of the product, Defendant periodically shipped the undamaged product back to Plaintiff for storage.

17. Defendant ultimately determined that Plaintiff's employees had breached 14,377 boxes and 71,162 bags containing its chile product. This resulted in 355,810 pounds of chile product adulterating. Trial Ex. D-7 at 341–345.

## D. Damages

18. Defendant's chile product has a sales price of $1 per pound. Thus, the total value of the product damaged by Plaintiff is $355,810. Trial Ex. D-8. After accounting for incremental costs, Defendant's lost product revenue is $346,460. *Id.* Further, Defendant incurred transportation costs of $3,500 for the additional trips needed to take the product back to its facility for inspection followed by returning the undamaged product to Plaintiff's facility for storage prior to sale. *Id.*

19. Defendant failed to provide the Court sufficient evidence to entitle it to the inspection costs[3] and the costs for replacing boxes that it requested.[4]

---

[3] Defendant alleges that it had to pay employees to inspect the bags from January 2016 until June 2016. However, Defendant only provided the Court with payroll records from January 1, 2016, through June 30, 2016, to prove the inspection costs. However, Defendant's historical payroll records show for that same period that it paid its hourly employees a total of $173,550.90 in 2014, $165,822.75 in 2015,

20. Defendant conceded that it did not pay any of the charges it accrued storing its product with Plaintiff after the transaction dated October 14, 2015. *See* Trial Exs. D-8, D-10.

21. Plaintiff's billing report shows that the unpaid charges currently total $122,219.02. Trial Exs. P-2, P-27.

### III. CONCLUSIONS OF LAW

#### A. Jurisdiction

As a preliminary matter, this Court concludes that it has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2).

#### B. Plaintiff's Breach of Contract Claim

*1. Applicable Law*

"In Texas, the elements of a claim for breach of contract are: (1) a valid contract between the plaintiff and the defendant, (2) performance or tender of performance by the plaintiff, (3) breach by the defendant, and (4) damage to the plaintiff as a result of the breach." *Garofolo v. Ocwen Loan Servicing, L.L.C.*, 669 F. App'x 219, 220 (5th Cir. 2016) (*per curiam*) (internal quotation marks omitted) (quoting *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 858 (5th Cir. 2014)). However, "[i]t is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is

---

$223,980.40 in 2016 (period of inspection), and $250,519.81 in 2017. *See* Trial Ex. P-34. Defendant's failure to provide the Court with records of which employees were conducting the inspections, the time they spent, and the amount they were paid puts the Court in the position of having to guess what the inspection costs were. The Court will not engage in speculation.

[4] Similarly, Defendant did not provide any inventory records to support its request for the costs of replacing boxes. Further, Defendant requests damages for the purchase of larger boxes to accommodate the bloated bags. *See* Trial Ex. D-8. Defendant has not proven that Plaintiff was responsible for the bags bloating. Moreover, it is unclear if the boxes that were replaced had already been damaged as a result of the bloating before being pierced.

discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004). "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Stewart v. Sanmina Texas L.P.*, 156 S.W.3d 198, 214 (Tex. App.—Dallas 2005, no pet.). Further, in determining the materiality of a breach, Texas follows the Restatement (Second) of Contracts. *Mustang Pipeline Co.*, 134 S.W.3d at 199 ("The Restatement lists five circumstances significant in determining whether a failure to perform is material"). The five factors that Texas courts consider in determining whether a breach is material are:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Matter of Dallas Roadster, Ltd.*, 846 F.3d 112, 127 (5th Cir. 2017) (quoting *Mustang Pipeline Co.*, 134 S.W.3d at 199).

There is, however, a relevant exception to the principle that when one party to a contract commits a material breach of that contract, the other party is excused from further performance. That exception states: "A party who elects to treat a contract as continuing deprives himself of any excuse for ceasing performance on his own part." *Hanks v. GAB Bus. Services, Inc.*, 644 S.W.2d 707, 708 (Tex. 1982). *See also Vera v. Bank of Am., N.A.*, 569 F. App'x 349, 352 (5th

Cir. 2014) (*per curiam*) ("Although Plaintiffs allege that Defendants breached the terms of the Deed first by failing to comply with RESPA, Plaintiffs' subsequent non-performance is not excused because they continued for years after Defendants' alleged noncompliance to reside in the Property and to make mortgage payments on the Note."). *Long Trusts v. Griffin*, 222 S.W.3d 412, 415–16 (Tex. 2006) (holding that treating a contract as continuing deprives a party of the right to cease performance even when the other party to the contract has committed a material breach).

*2. Analysis*

**Conclusion of Law #1: Defendant breached the Storage Agreement by failing to pay the storage charges.**

There is not much dispute with regard to Plaintiff's breach of contract claim. The only significant disagreement is over whether or not Defendant treated the contract as continuing. Both parties admit there was a contract between the two. Plaintiff performed its duties under the contract by storing Defendant's chile product. Defendant breached the contract by not paying the incurred charges. Plaintiff suffered damages in the amount of $122,219.02, the total of the unpaid charges.

**Conclusion of Law #2: Defendant treated the Storage Agreement as a continuing contract, so it is not excused from performance.**

Defendant's core defense is that Plaintiff breached the contract first when it pierced Defendant's bags of chile product, which excused Defendant from performance. Plaintiff's employees piercing the bags is a material breach of the contract between the parties. This is because the benefit of the contract for Defendant was storing its chile product with Plaintiff to keep it safe and unadulterated prior to sale. Plaintiff's employees piercing the bags resulted in

the product becoming adulterated and prevented Defendant from selling it. Further, Plaintiff did not cure its breach.

However, the continuing contract exception applies in this case. While Defendant has put forward a plausible argument that it was only attempting to mitigate its damages during the period of inspection and was not treating the contract as continuing, Defendant still chose to return its undamaged product for storage at Plaintiff's facility during that period. Defendant had other options for storing its product, including another nearby refrigerated storage warehouse where it was already storing some of its chile product. *See* Trial Ex. P-24 (showing Defendant's invoices from Valley Cold Storage and Transportation). Therefore, Defendant had a duty to pay the storage charges it incurred under the Storage Agreement. Accordingly, Plaintiff is entitled to recover $122,219.02 in unpaid storage charges from Defendant.

## C. Defendant's Breach of Contract Counterclaim

### 1. Applicable Law

As previously stated, there are four elements in Texas for a breach of contract claim: "(1) a valid contract between the plaintiff and the defendant, (2) performance or tender of performance by the plaintiff, (3) breach by the defendant, and (4) damage to the plaintiff as a result of the breach." *Garofolo*, 669 F. App'x at 220 (internal quotation marks omitted) (quoting *Doubletree Partners, L.P.*, 739 F.3d at 858). Further, Texas has enacted statutes that specifically govern storage contracts. One such statute, Texas Business and Commerce Code § 7.204, has two provisions dealing with limitation on liability and damages clauses in warehouse contracts. The first provision holds:

> A warehouse is liable for damages for loss of or injury to the goods caused by its failure to exercise care with regard to the goods that a reasonably careful person would exercise under similar circumstances. However, unless otherwise agreed,

the warehouse is not liable for damages that could not have been avoided by the exercise of that care.

*Id.* § 7.204(a). The second provision allows that "damages may be limited by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage beyond which the warehouse is not liable." *Id.* § 7.204(b). However, when analyzing a clause that limits the liability of a warehouse, the Court must determine if it "violates the constitution or statutes or public policy." *Allright, Inc. v. Elledge*, 515 S.W.2d 266, 267 (Tex. 1974).

Furthermore, the bailor-bailee relationship between the depositor and warehouse must be considered due to its special rules. *See* 73 Tex. Jur. 3d Warehouses § 3 (2018) ("When goods are stored with a warehouse, the relationship of bailor and bailee is created between the depositor or owner and the warehouse operator."). For example, "Texas has long held that negligence is presumed when a bailee has received goods for storage and either returns them in damaged condition or fails to return them at all." *Int'l Nickel Co. v. Trammel Crow Distribution Corp.*, 803 F.2d 150, 153 (5th Cir. 1986). Further, limitation of liability clauses are "strictly construed against the bailee." *Elledge*, 515 S.W.2d at 268.

*2. Analysis*

Here, the dispute again is fairly limited. The parties agree that there was a contract. The parties further agree that both sides were performing the contract. Plaintiff concedes that it caught its employees poking holes in Defendant's bags of chile product.[5] Plaintiff admits that Defendant suffered some damages for the adulteration of its chile product due to the piercing of

---

[5] While Plaintiff implicitly argued that its employees piercing the bag could have fallen outside the duty of reasonable care it owed to Defendant because they were not instructed to poke holes in the bag, it is clear from the testimony of Plaintiff's witnesses, Felipe Castaneda, Luis Heiras, and Oscar Medina, and Defendant's witness, Jesus Arriola, that the bloating of the bags caused the bags to breach the top of the boxes, which made stacking the pallets safely difficult and caused bags to fall when they were stacked on shelves, posing a hazard to employees working below. Thus, it is clear that the employees who pierced the bags were not acting maliciously; instead, they believed they were solving a safety issue. This was negligent behavior, not malicious behavior.

the bags. However, the main disputes in this case are over how much product was damaged and whether Defendant's damages are limited by the Storage Agreement.

**Conclusion of Law #3: Plaintiff breached the Storage Agreement when its employees negligently damaged 355,810 pounds of Defendant's chile product.**

First, with regard to how much product was damaged, Plaintiff's witness, Mr. Castaneda, testified that he believed only a maximum of 15,000 pounds could have been damaged because the damage could have only occurred on the day when he caught the employees poking holes in the bags. However, Mr. Castaneda's testimony is undermined by Mr. Medina testifying that he saw the employees poking holes in the bags of chile product a separate time and Mr. Arriola's testimony that the poking of holes had gone on for weeks. Further, Mr. Castaneda caught the employees poking holes in the bags in February 2016. Defendant had already been inspecting bags and boxes for piercings for weeks by that time. *See* Trial Ex. D-7 at 341–345 (showing that inspections began in the middle of January 2016). Moreover, Defendant provided a report showing that 14,377 boxes and 71,162 bags containing its chile product were breached. *Id.* Negligence is presumed when a bailee receives goods for storage and returns them in a damaged condition. *Int'l Nickel Co.*, 803 F.2d at 153. The documentary and testimonial evidence in front of the Court only supports the presumption that Plaintiff was negligent and that it damaged 355,810 pounds of Defendant's chile product.

**Conclusion of Law #4: Section 11(c) of the Storage Agreement is enforceable and limits the amount of damages Defendant can recover.**

Next, the Court must determine if Plaintiff's limitation of damages clause will apply here.[6] Texas Business and Commerce Code § 7.204(b) explicitly allows limitation of damages

---

[6] Plaintiff also advances a theory that Section 2 of the Storage Agreement prevents Defendant from recovering any damages because the bills of lading for the delivered chile product identified

clauses. Texas law does mandate that those clauses cannot violate "the constitution or statutes or public policy." *Elledge*, 515 S.W.2d at 267. Nevertheless, Defendant did not advance an argument as to how Section 11(c) of the Storage Agreement could violate the constitution, statutes, or public policy. Further, in *International Nickel Co.*, the Fifth Circuit upheld a similar limitation of damages clause. *See* 803 F.2d at 152–53. Thus, the limitation of damages clause is enforceable.

**Conclusion of Law #5: Section 11(c) limits the damages Defendant can recover to the total amount of the storage invoices.**

There was, however, a dispute over the meaning of the clause. In the copy of the Storage Agreement provided by Defendant, the clause in Section 11(c) limits damages to "see rate quotation," while the same clause in the copy of the Storage Agreement provided by Plaintiff limits damages to "amounts billed." *Compare* Trial Ex. P-8 *with* Trial Ex. D-16 at 17. As the bailee, the limitation of damages clause is strictly construed against Plaintiff. *Elledge*, 515 S.W.2d at 268.

In attempting to determine the meaning of the clause, Plaintiff's witness, Mr. Castaneda, opined that it meant only the storage rate, but he later backtracked and said that he did not know what it meant. Defendant advanced a theory that it meant the total amount of the storage invoice. The Storage Agreement was printed on the back of the invoices containing the charges each time Defendant deposited its shipments of chile product. *See generally* Trial Ex. D-16. Each of the charges on the invoice contain a rate quotation. *Id.* Further, the later version of the Storage Agreement provided by Plaintiff uses "amounts billed" instead of "see rate quotation."

---

Plaintiff as the consignee. *See* Trial Ex. P-8 (displaying a copy of the Storage Agreement); Trial Ex. P-9 (showing Plaintiff as the consignee on the bills of lading). However, such an interpretation would conflict with Section 11 of the Storage Agreement. *See supra* note 2. The Court's interpretation of Section 2 is that it pertains only to Plaintiff's liability as named consignee, not its liability for storing goods as a bailee.

*See* Trial Ex. P-8. Thus, the Court interprets "see rate quotation" to mean the total amount of the storage invoices. This is consistent with the language of "amounts billed" used in the later Storage Agreement. However, the Court's interpretation would omit the "finance charges" because they do not include a rate quotation.

Defendant paid $69,229.52 in storage costs to Plaintiff. Further, Defendant owes $122,219.02 in unpaid storage charges to Plaintiff. However, that $122,219.02 in unpaid storage charges includes some finance charges. When the $9,522.80 of finance charges are removed, the Court is left with a figure of $112,696.22 of unpaid charges. *See* Trial Ex. P-2. Thus, the Court adds the unpaid charges, less the finance charges, to the already-paid charges, which results in a total amount of $181,925.74. Therefore, Defendant is entitled to recover $181,925.74 in damages for its adulterated chile product.

## IV. CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** and **DECLARED** that:

i. Defendant M.A. & Sons, Inc. breached the Storage Agreement.

ii. Plaintiff Southwest Refrigerated Warehousing Services Joint Venture is entitled to recover $122,219.02 in unpaid storage charges from Defendant.

iii. Plaintiff breached the Storage Agreement.

iv. Defendant is entitled to recover $181,925.74 in damages for its adulterated chile product from Plaintiff.

v. After offsetting Defendant's damages with Plaintiff's damages, Defendant shall recover $59,706.72 in damages from Plaintiff.

**IT IS FURTHER ORDERED** that the Court shall separately consider and rule upon Defendant's entitlement to prejudgment and post-judgment interest. The parties have **seven (7)**

**days from the date of this order** to provide supplemental briefing as to whether Defendant is entitled to recover prejudgment and post-judgment interest. *See, e.g.*, 28 U.S.C. § 1961.

**IT IS FINALLY ORDERED** that all other relief sought and not granted is **DENIED**.

So ORDERED and SIGNED this 14th day of December 2018.

DAVID C. GUADERRAMA
UNITED STATES DISTRICT JUDGE